

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ENTERED
02/11/2016

| | | |
|---|---|---|
| IN RE: | § | |
| VICKY GRIBBLE WRIGHT; aka VICKY L | § | CASE NO: 13-10472 |
| WRIGHT; aka VICKY WRIGHT; fdba VICKY | § | CHAPTER  13 |
| WRIGHT/BORDERS CONTRACTORS INC. | § | |
| Debtor | § | CASE NO: 11-10483 |
| | § | CHAPTER 7 |
| | § | |
| | § | JUDGE RODRIGUEZ |

**MEMORANDUM OPINION**
**APPROVING THE CHAPTER 7 TRUSTEE'S MOTION TO COMPROMISE**
**AND**
**DENYING THE DEBTOR'S MOTION TO COMPROMISE**
[*Resolving Case No. 11-10483, ECF Nos. 69, 80, and 83*
*&*
*Case No. 13-10472, ECF No. 75, 84, and 87*]

## I. Introduction

This case involves a duel between pre-petition and post-petition interests. Before this Court is a pair of mutually exclusive motions emanating from separate and sequential, yet simultaneously open, bankruptcy estates involving the same debtor. The debtor first filed a chapter 7 case, wherein the chapter 7 trustee now asks this Court to approve a settlement agreement associated with pre-petition property of the chapter 7 estate and a related post-petition lawsuit in state court. While the chapter 7 case was still open post-discharge, the debtor filed a chapter 13 case. The debtor in her chapter 13 case requests that this Court approve her version of the settlement, but conditioned on the rejection of the chapter 7 trustee's claim to his portion of the settlement proceeds. This Court will now decide which motion for the approval of the settlement is to emerge victorious.

## II. Findings Of Fact

This Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rules of Bankruptcy Procedure 7052, which incorporates Fed. R. Civ. P. 52. To the extent that any Finding of Fact constitutes a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such. This Court reserves the right to make any Findings and Conclusions on its own analysis or as requested by any party.

1.      On August 15, 2011, Vicky Gribble Wright (hereinafter "***Debtor***") petitioned for chapter 7 bankruptcy under title 11 of the United States Code (hereinafter the "***Bankruptcy Code***" or "***Code***").[1]  [Case No. 11-10483; ECF No. 1].

2.      On Schedule B, regarding her personal property interests, Debtor listed an unspecified quantity of stock in API Pipe & Supply, LLC (hereinafter "***API***"), and the alleged value of Debtor's stock interest was "unknown."  *Id.* at 9.  Moreover, the alleged value of her claimed exemption over the API stock was listed as "unknown."  *Id.*  The chapter 7 trustee, William Romo (hereinafter "***Romo,***"), has not objected to this exemption.

3.      On January 18, 2012, after multiple continuances, a final Meeting of Creditors was held and concluded. The same day, Romo filed a Notice Of Assets, Notice To Creditors And Other Parties In Interest Of The Need To File Claims (hereinafter "***Notice of Assets***"), which stated that the case first appeared to be a no asset case, but that it subsequently appeared that there is an estate from which a dividend to creditors may be paid.  [ECF No. 15].  Romo notified creditors to file a proof of claim by April 17, 2012.  *Id.*

4.      According to the claims register, the total amount of allowed filed claims in the

---

[1] Any reference to "**Code**" or "**Bankruptcy Code**" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

chapter 7 case is $60,948.11, of which $46,067.28 constitutes unsecured claims. No objections to claims have been filed in the chapter 7 case. This is notwithstanding one claim for $12,444.53, which was filed beyond the bar date, and therefore is not an allowed claim.  [Claim No. 5].

5.　　On January 23, 2012, Debtor received a discharge of debts pursuant to § 727. [ECF No. 17].  Importantly, Debtor's chapter 7 case still remains open.

6.　　On June 7, 2013, Romo filed a Status Report stating that he was pursuing the sale of Debtor's interest in API.  [ECF No. 29].

7.　　On September 6, 2013, Romo filed a Trustee's Application to Employ Waldron & Schneider, L.L.P. as Counsel Nunc Pro Tunc, Kimberly A. Bartley (hereinafter "***Bartley***"), a lawyer who has purportedly been assisting Romo since July 1, 2013.   [ECF No. 31]. Specifically, Romo wished to employ Bartley to help him to investigate the API interest and its value to the estate for the purpose of a sale.  *Id.* at ¶ 5.  Bartley began her employment on September 30, 2013 by this Court's Order Authorizing Employment of Counsel Nunc Pro Tunc, which additionally granted retroactive employment to July 1, 2013.  [ECF No. 34].

8.　　Also on September 6, 2013, Romo filed a Motion to Compromise Pursuant to Fed. R. Bank. P. 9019,  [ECF No. 33], which asked this Court to approve a settlement wherein Romo alleged: that Debtor purportedly transferred 7.83% of the Interest in API owned by the chapter 7 estate to a Mr. Gary Cain for $45,179.25; that Debtor and the remaining shareholders executed unanimous consent to the transfer; that the maximum value of Debtor's exemption over the API stock interest is $5,928 after deducting the $800 allegedly attributable to a Harlingen Area Teachers Credit Union checking account; that he demanded turnover of the API interest, as Debtor continued to assert control over the property; and that the 2012 K1 issued to Debtor shows that the interest in API is valued in excess of $150,000. Finally, Romo requested that this

Court approve the terms of the settlement signed by API, Mr. Cain, and Ms. Tomlinson, provisioning for Romo to release all potential claims against said parties and to transfer the API stock interest to said parties in exchange for $100,000.  *Id.*  In opposition, Debtor protested that she had potential claims against API, the pursuit of which would provide a better opportunity to extract more value on account of the API stock interest.  [ECF No. 43].  Romo's aforementioned Motion to Compromise was thereafter withdrawn effective March 26, 2014, as Romo claimed to have newly discovered that the settlement was not in the best interest of the chapter 7 estate. [ECF No. 57].

9.      On October 31, 2013, Debtor filed a chapter 13 bankruptcy petition.  [Case No. 13-10472; ECF No. 1].

10.     On her chapter 13 Schedule D, Debtor alleged to have secured debts of $141,243.43.  *Id.* at 14.  Debtor further alleges in her Schedule I that she is disabled and receives as income of $1,820 in monthly Social Security benefits.  *Id.* at 20.  Debtor further alleges in her Schedule J that she incurs $1,619.66 in monthly expenses, leading to a net monthly disposable income of $200.34.  *Id.* at 21.  Debtor further alleges in her Schedule A that she owns three parcels of real property totaling $190,368 in value and which are burdened by secured claims totaling $113,012.61.  *Id.* at 8.  On her Schedule B, Debtor further alleges that she owns $51,422.12 in personal property.  *Id.* at 12.  Finally, on her Schedule C, Debtor claims a total value in all property of $211,790.12 and exemptions upon all property of $71,852.51.  *Id.* at 13.

11.     On her Schedule B, Debtor alleged that she owned a "25% interest in API… (currently now administered in the Chapter 7 bankruptcy case… Debtor estimates it to be worth at least $1,300,000… Less estimated claims of $_____...)."  *Id.* at 10.  However, the scheduled value was "unknown."  *Id.*

12.     Special counsel, James P. Grissom (hereinafter "*Grissom*"), was hired by Debtor on a contingency fee basis for the purpose of pursuing Debtor's claims against API and the Tomlinsons either in or out of state court, as per Debtor's objection against Romo's motion to compromise that she had potential claims against said parties. On January 07, 2014, Debtor filed a Motion to Approve Employment of Counsel in the chapter 7 case. [Case No. 11-10483; ECF No. 40]. This Court entered an Order Approving Employment of Counsel in the chapter 7 case on January 31, 2014. [ECF No. 41]. Importantly, the chapter 7 Order provisioned for Grissom to be employed by Debtor rather than the chapter 7 trustee.

13.     On March 19, 2014, Romo filed a proof of claim for $94,179.25 in the chapter 13 case. [Claim No. 6]. To support his claim, Romo attached a May 3, 2013 exhibit in which Debtor purported to transfer 7.8333% of her 24.50% percent interest in API to Gary Cain, a man who desired to ascend to membership in API. [Claim No. 6-1; Ex. A at 3]; [Case No. 11-10483; ECF No. 33 at ¶ 4] (Romo's first chapter 7 Motion to Compromise Pursuant to Bank. R. 9019, mentioning that). Additionally, Romo also alleges that Debtor's retention of $49,000 in chapter 7 post-petition K-1 distributions on account of the interest in the API stock was part of his calculation in filing his proof of claim. [ECF No. 80 at ¶ 18].

14.     On July 31, 2014, Debtor filed an objection to Romo's proof of claim in the chapter 13 case, essentially alleging that her purported transfer of 7.83% of the API stock interest to Gary Cain was ineffective, because it lacked unanimous shareholder consent to the transfer as required by the agreement. [Case No. 13-10472; ECF No. 52, at ¶ 3]. In support, Debtor has offered and admitted a transfer document of an unknown date (evidently sometime around 2010), entitled "Unanimous Consent to the Assignment in [API] to Gary Cain, Vicky Wright, and Peggy Jo Tomlinson, and the Admission of [These Parties], Assignees, As Members of [API],"

("**Document**") wherein the Document alleged that while the records of API showed Daniel Wright holding a 49% interest and James Tomlinson holding a 51% interest, Gary Cain and the two stakeholders were actually one third partners. [Debtor Ex. 15]. The Document then alleged that in 2005, James Tomlinson and Daniel Wright agreed to recognize Gary Cain as one third partner. *Id.* The Document alleges that in 2006, James Tomlinson died, before the two shareholders could convey a portion of their shares in order to accurately reflect the purported reality of ownership. *Id.* The Document recognizes that Debtor and Daniel Wright, by virtue of divorce, each hold a 24.5% interest, of which they each agreed to transfer 7.8333% to Gary Cain. *Id.* The Document also recognizes that Peggy Tomlinson holds 25.5% as her community property interest on the death of James Tomlinson and 25.5% as administrator of James Tomlinson's estate, of which she agreed to transfer 8.83% on account of each holding. *Id.* These transfers, accounting for Gary Cain's final 33.33% interest, were to encumber his right to distribution until Debtor and Daniel Wright received $45,179.25 each and Peggy Tomlinson and the Tomlinson estate received $45,179.25 each. *Id.* The Document notes that the agreement may be individually executed in multiple counterparts, each of which is deemed an original. *Id.* The agreement submitted as an exhibit contains only the signature of Debtor, under which was noted "[s]ubject to the terms of Addendum of Vicky Wright to Unanimous Consent to the Assignment of Member Interest in [API]." *Id.*

15. On August 04, 2014, Debtor filed an Amended Uniform Plan and Motion for Valuation of Collateral (hereinafter "**Plan**") in her chapter 13 case. [ECF No. 54]. Debtor's confirmed Plan provisioned for the payment of $200 from months 1-7, $2,350 from months 8-60, and a lump sum of $40,000 on month 24, for a grand total of $165,950. [ECF No. 54 at 8]. In total, the Plan ascertained that the best interest test valued Debtor's non-exempt property at

$44,477.65, estimated a net available to creditors of $152,674, and forecast a 100% dividend to the unsecured creditors. *Id.* at 10. There was $183,899.77 worth of claims contemplated in the Plan. *Id*. This Court confirmed the Plan on November 6, 2014. [ECF No. 66].

16. Due to Romo's failure to respond to Debtor's objection to his claim in the chapter 13, this Court entered an Order Disallowing Claim of William C. Romo, Chapter 7 Trustee by default on September 23, 2014. [ECF No. 58].

17. In order to prosecute the State Court Case, this Court approved Grissom's employment by Debtor in the chapter 13 case on December 31, 2014, the Order of which mirrors the Order approving employment of Grissom by Debtor in the chapter 7 case. [ECF No. 72].

18. On January 7, 2015, Debtor and Daniel Wright (hereinafter, collectively "***Plaintiffs***") filed a petition in the County Court of Law in Hidalgo County, TX (hereinafter "***State Court Case***") against Defendants: API; Peggy Tomlinson; Tommy J. Tomlinson; and James B. Tomlinson (hereinafter, collectively "***Tomlinsons***" or "***Defendants,***" with the inclusion of API). [Debtor Ex. 2]. The causes of action included: conversion; breach of fiduciary duty; civil conspiracy; a violation of the Theft Liability Act; declaratory judgment; and mental anguish and financial harm damages. *Id.*at ¶¶ 15-31. Essentially, Plaintiffs claim that API, by and through Peggy Tomlinson, had issued erroneous K-1 forms for more than $300,000 by the end of 2013, leading to increased I.R.S. tax liabilities for the Plaintiffs. *Id.*

19. On October 15, 2015, the parties to the State Court Case entered into a written settlement agreement resolving the dispute (hereinafter the "***Settlement***"). [Debtor Ex. 4]. Though Romo and the IRS were not named participants in the State Court Case, they participated in discussions on and entered into the terms of the Settlement. All parties to the Settlement talks were represented by counsel.

20.    The terms of the signed, underlying Settlement are as follows:

    a.    The parties agreed to settle all claims and controversies between them, which are asserted or assertable in the Settlement Agreement.   By the terms of the Settlement, Daniel Wright and Debtor are to relinquish their interests in API back to API;

    b.    as consideration for the Settlement, Plaintiffs and their attorneys are to receive $650,000;

    c.    Plaintiffs to hold Defendants harmless;

    d.    Signatory warrants that the claims and interests which are the subject matter of the Settlement have not been assigned and are free of encumbrance

    e.    The agreement shall be construed under Texas law

    f.    The sum of $650,000 shall be paid by API as follows:

        i.    $100,000 to be paid to Romo (the "***$100,000 Carveout***")

        ii.   $326,914.90 to be paid to the United States Treasury  on behalf of Daniel Wright

        iii.  $223,085.10 to be paid collectively to Debtor, Daniel Wright, and Grissom.[2]

    g.    Debtor to release any and all claims she may have to the ownership interest in API, including any exemptions under § 522(d).

    h.    Romo to release claims against API and Debtor.

    i.    Romo to retain any distributions made in connection with Debtor's ownership of API, including, but not limited to, a K-1 payment of $12,446.04.

---

[2] Grissom's fee arrangement with Debtor provisions for him to collect 40% of the gross amount of the Settlement, subject to the provision that his fees shall be limited to the maximum amount allowed by law "after satisfaction of any fees or sums due the Ch. 7 Trustee or creditors" in the chapter 7 case.  [Debtor Ex. 1 ¶ 2.01].

j. The IRS shall accept any monetary transfers from API on behalf of Daniel Wright.

k. Debtor to identify that she does not own any shares in API and releases API and the Tomlinsons from any liability.

21. Two competing motions to approve the above Settlement were entered in the chapter 7 and chapter 13 cases, the chapter 7 version filed by Romo and the chapter 13 version filed by Debtor.

22. In the Chapter 7 Motion to Compromise Pursuant to Bank. R. 9019 (hereinafter "***Chapter 7 Compromise***") filed on October 22, 2015,  [Case No. 11-10483; ECF No. 69], Romo asks this Court to approve the following terms:

a. API shall pay Romo $100,000, plus any tax liability incurred as a result.

b. API shall pay the United States Treasury $326,914.90 for Daniel Wright's tax liability.

c. API shall pay Debtor and Daniel Wright $223,085.10 collectively.

d. Debtor shall release any claims to proceeds attributable to her "wildcard" exemption, attributable to the API interest, under § 522(d)(5) in the chapter 7 case.

e. Debtor shall release any claims to proceeds previously received by Romo which are attributable to her stock interest in API.

f. Romo shall transfer the API stock interest to the remaining members of API, all three Tomlinsons.

g. Upon payment of the Settlement proceeds and transfer of the API stock interest, Romo, API, Daniel Wright, and Debtor shall mutually release all claims which

may have been asserted in connection with the API stock interest.

23.     On November 12, 2015, Debtor filed an Amended Motion for Approval of Compromise Settlement Agreement, Objection to Motion for Approval of Compromise Settlement Agreement of Ch. 7 Trustee and Approval of Attorney's Fees and Costs (hereinafter "*Chapter 13 Compromise*"),  [Case No. 13-10472; ECF No. 75], in the chapter 13 case, which contained the following provisions and arguments:

   a.   A request that this Court deny Romo's Chapter 7 Motion to Approve.

   b.   Alleging that the purported transfer by Debtor of 7.83% of her stock interest to Gary Cain post-chapter 7 petition, which is the basis for Romo's claim that he had a cause of action he released in consideration for the $100,000, was ineffective, because the transfer agreement is restricted to unanimous member approval, of which none was obtained. Debtor thus asserts that Romo was without consideration to sign the Settlement, because he had no claim to settle.  [ECF No. 74].

   c.   Debtor agrees to fully release the Defendants in consideration for the monetary amount in the Settlement.

   d.   Debtor requests that any monies designated to Romo be redirected towards the satisfaction of the chapter 13 creditors, because no claims remain unpaid in the chapter 7.

24.     In support of their motions, this Court, on December 18, 2015, conducted an evidentiary Hearing (hereinafter the "*Hearing*"), wherein the parties presented their respective arguments as to why this Court should approve one Motion to Approve over the other.

25.     All of Debtor's and Romo's Exhibits were offered and admitted into evidence

without opposition.

26.    This Court expressed concerns at the Hearing that under either Motion to Approve, since the state court lawsuit may derive from property of the chapter 7 estate, the Settlement proceeds thereto may constitute proceeds or offspring of chapter 7 property pursuant to 11 U.S.C. § 541(a)(6), and since Grissom had not been employed by Romo, Grissom could not be compensated from the chapter 7 estate as per the prohibition under 11 U.S.C. § 327.  The parties were granted leave of court to submit briefing on these matters.

27.    In Romo's brief, he alleges that the chapter 7 estate holds a $45,179.25 claim against Debtor for her purported post-petition transfer of interest in API and a $49,000 claim against Debtor for her alleged receipt and retention of tax distribution made by API on account of the chapter 7 interest in API.  [Case No. 11-10483; ECF No. 80 at ¶ 18].  Romo also noted that these two figures combined, which result in a total claim of $94,179.25, account for Romo's decision to file a proof of claim in the chapter 13case in said amount in order to save the trouble and expense of filing an adversary to so recover.  *Id.*  Romo also contended that he held potential causes of action against API and Peggy Tomlinson related to the post chapter 7 petition purported transfer of the interest in API to Gary Cain. Romo asserts that the $100,000 Carveout for the chapter 7 estate in the Settlement agreement was a proceed of the chapter 7 estate, being a disposition and administration of the interest in the API stock and claims derived therefrom.  *Id.* at ¶ 25.  Romo further asserts that the Settlement conference was intended to be a global effort by the parties in order to resolve the state court litigation and *all* parties' pending claims.  *Id.* at ¶ 20.  Romo also lodged judicial estoppel arguments against Debtor's objection to his Chapter 7 Compromise. Essentially Romo asserts that Debtor has objected to Romo's receipt of $100,000 in the Chapter 7 Compromise while seeking approval of the exact same Settlement in the

Chapter 13 Compromise (including Romo's receipt of $100,000), thereby asserting inconsistent positions in two cases. *Id.* at ¶ 29. Romo further demonstrates that Debtor has not withdrawn her Chapter 13 Compromise, and thus she is estopped from objecting to Romo's receipt of $100,000 for her adoption of inconsistent positions in two cases. *Id.*[3]

28.     Debtor also offered her own brief, discussed in greater detail *infra*. Although thorough, the basic argument is that the Settlement is entirely derived from the State Court Case, which itself is entirely derived from an injury personally attributable to Debtor and Daniel Wright, a cause of action that arose post-petition to the chapter 7 case. [Case No. 13-10472; ECF No. 80]. Debtor asserts that this therefore renders the Settlement *not* a proceed of chapter 7 property of the estate and not a cause of action acquired by the chapter 7 estate pre or post-petition. *Id.* Debtor also asserts that Romo never engaged in any exchange of the property interest in the API stock for the chapter 7 estate's $100,000 share, and therefore is not a proceed of the chapter 7 estate. *Id.*

### III. Legal Authority

#### A. Jurisdiction and Venue

District courts have jurisdiction over "all proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11, while "arising in" jurisdiction is not based on a right expressly created by title 11, but rather based on claims that would have no existence outside of bankruptcy. *See Wood v. Wood*, 825 F.2d 90 (5th Cir. 1987). Claims "related to" cases under title 11 do not inhere rights created by title 11 or existing solely because of a bankruptcy case. Rather, "related to" claims vest jurisdiction to a bankruptcy court

---

[3] As this issue is not dispositive to the matter at bar, the resolution of which lies on other grounds, this Court simply notes that Debtor's Chapter 13 Compromise does indeed seek to deny Romo $100,000, and Debtor therefore does not assert inconsistent positions.

if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n. 6 (1995); *Wood*, 825 F.2d at 93.

Bankruptcy judges are empowered by statute "to hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11… and may enter appropriate orders and judgments." 28 U.S.C. § 157(b)(1).  However, before a bankruptcy judge may hear any case, the governing district court must "refer" the case to the bankruptcy court.  28 U.S.C. § 157 (a)-(b)(1).  "Arising under," "arising in," and "related to" bankruptcy cases are automatically referred to this Court.  *In re: Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012).  Under its § 157 authority, a bankruptcy court may enter final orders and judgments on "core" proceedings, but bankruptcy courts must submit to the district court (for *de novo* review) "proposed findings of fact and conclusions of law" on non-core proceedings "related to" a case under title 11.  28 U.S.C. § 157(c)(1).  Section 157 enumerates a non-exhaustive list of proceeding types considered "core."  28 U.S.C. § 157 (2)(A)-(P).  Furthermore, the Supreme Court has further clarified the definition of "core" as all proceedings that "arise in" a bankruptcy case or "arise under" title 11.  *Stern v. Marshall,* 131 S. Ct. 2594, 2605 (2011).

With the consent of all parties, however, a district court may authorize bankruptcy courts to enter orders and judgments in non-core, "related to" proceedings.  28 U.S.C. § 157(c)(2).

The instant motions involve core proceedings, because they involve questions of whether a bankruptcy court should approve a compromise in a bankruptcy case pursuant to Rule 9019, and moreover require that this Court consider what constitutes property of the chapter 7 and

chapter 13 estates pursuant to §§ 541 and 1306. Therefore, this Court has statutory authority to hear the instant matter and to enter any appropriate final judgment.

This Court may only hear a case in which venue is proper. Venue with respect to cases under title 11 is governed by 28 U.S.C. § 1408, which designates that venue may be commenced in the district "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity…" have been located for the one 180 day period preceding such commencement. Debtor lives in Harlingen, Texas. Therefore, venue is proper within this jurisdiction.

**B. Constitutional Authority to Enter a Final Order**

This Court also has an independent duty to evaluate whether it has the constitutional authority to sign a final order. *Stern*, 131 S. Ct. at 2594. In *Stern v. Marshall*, the Supreme Court considered the constitutional limitations that Article III imposes upon § 157's grant of final order and judgment powers to non-Article III courts. *Id.* The Supreme Court held that § 157 violated Article III to the extent that it authorized final judgments on certain matters. *Id.* at 2616. The Court found that the particular bankruptcy ruling in dispute did not stem from bankruptcy itself, nor would it necessarily be resolved in the claims allowance process, and it only rested in a state law counterclaim by the estate. *Id.* at 2618. The Court reasoned that bankruptcy judges are not protected by the lifetime tenure attribute of Article III judges, but they were performing Article III judgments by judging on "all matters of fact and law" with finality. *Id.* at 2618-19. Hence, the Court held that Article III imposes some restrictions against a bankruptcy judge's power to rule with finality. The Court found that a solely state law based counterclaim, while statutorily within the bankruptcy judge's purview, escaped a bankruptcy court's constitutional power. *Id.* at 2620. This Court reads *Stern* to authorize final judgments

only where the issue is rooted in a right created by federal bankruptcy or the resolution of which relies on the claims allowance process. In other words, this Court may issue final judgments and orders where the issue "arises in" or "arises under" bankruptcy, but not where the issue is merely "related to" bankruptcy.  *See* 28 U.S.C. § 157.   However, even where the case does create a "Stern problem," Article III will be satisfied where the parties to the case knowingly and voluntarily consent to the bankruptcy court's power to issue final judgments.   *Wellness International Network v. Sharif*, 135 S. Ct. 1932, 1938-39 (2015).

This Court has concluded that the instant motions involve core proceedings for the purpose of § 157, being solely rooted in bankruptcy law under title 11. These pure bankruptcy law issues, involving the application of Rule 9019 and §§ 541 and 1306 property of the estate, are also core for the purpose of a constitutional analysis, and this Court thus retains the constitutional authority to enter a final order applicable to the instant motions.

## IV. Conclusions of Law

### A.  Is the Legal and Equitable Interest in the API Stock, Property of the Chapter 7 or Chapter 13 Estate?

To evaluate the alternative appropriateness of the competing motions to approve the Settlement, this Court first considers which estate held an interest in the API stock at the time the Settlement was entered, because, as this Court shall discuss in greater detail later, the particular Settlement provisions for the complete release of Debtor's pre-chapter 7 petition 24.5% interest in API, and thus constitutes an exercise of the right to that property.  *See* § 541(a)(6) (property of the estate includes "proceeds, product, offspring, rents, or profits of or from property of the estate…").  *Cf. Matter of Wischan*, 77 F.3d 875, 877 (5th Cir. 1996) (post-petition settlement proceeds on account of prepetition cause of action remains part of the estate); *In re Croft*, 737 F.3d 372, 375 (5th Cir. 2013) (The Supreme Court of Texas defines property broadly, and it is

well established that causes of action belonging to the debtor are property that becomes part of the estate) (citing *Womack v. Womack*, 172 S.W.2d 307 (Tex. 1943)).

    1.  <u>Property of the Estate</u>

Under § 541(a), "[t]he commencement of a [bankruptcy] case under… [title 11] creates an estate." A bankruptcy estate is an entity, legally distinct from the debtor, that is provisioned for the trustee's administration of the debtor's case to satisfy the debtor's creditors to the most equitable and effective extent. *Ad-X Intern., Inc. v. Kolbjornsen*, 97 F. Appx. 263, 266 (10th Cir. 2004) (stating that the debtor and his bankruptcy estate are distinct entities in an individual's bankruptcy proceeding); *see also In re Buckeye Countrymark, Inc.*, 251 B.R. 835, 840 (Bankr. S.D. Ohio 2000) (a trustee is not the alter ego of the debtor, but rather a "separate legal entity" that owes a fiduciary obligation to the bankruptcy estate and the creditors to whom the estate benefits); *Property of the Estate, Black's Law Dictionary* (10th ed. 2014) ("A debtor's legal and equitable interests in property at the beginning of a bankruptcy case where the property is subject to administration.").

Section 541(a)(1) provides that property of the bankruptcy estate is to include "all legal and equitable interests of the debtor in property as of the commencement of the [bankruptcy] case," subject to a list of narrow exceptions not relevant here. For the purpose of § 541(a)(1), "all legal and equitable interests" is a vastly broad provision, which includes all kinds of tangible and intangible property, causes of action, and other forms of property. 5 Alan N. Resnick & Henry Sommer, *Collier on Bankruptcy* ¶ 541.03 (16th ed. 2015). In order to determine whether the debtor held a § 541(a) property interest at the proverbial snapshot taken upon filing, the courts must look to the underlying state law governing the property right to see if that right was held by the debtor, unless there is a federal interest that requires a different result. *Butner v. United*

*States*, 440 U.S. 48, 54-55 (1979). *Cf. In re Frost*, 744 F.3d 384 (5th Cir. 2014) (under the snapshot rule, all exemptions are determined at the time of petition).

Under the governing law, there is no doubt that Debtor's interest in API became property of the chapter 7 estate at the time of the filing of the chapter 7. Debtor testified that she obtained ownership of 24.5% of API in 2010, by virtue of a divorce from her then-husband. When the chapter 7 case was filed on August 15, 2011, Debtor held that 24.5% interest in API and scheduled it as having an "unknown value." The chapter 7 estate assumed ownership in that interest in API at the time of filing, by operation of § 541(a)'s provision for the inclusion of all of Debtor's interests. However, the analysis does not end there, because property of the estate, including the API interest, is subject to exemption law and other means by which debtors may recapture property back from the estate.

2.  Exempting Property From the Estate

The first means of recapture is exemptions. Debtor claimed an "unknown" exemption under § 522(d)(5) in the chapter 7 case. At the time of Debtor's filing of the chapter 7 petition, § 522(d)(5) provided, although the dollar figures have since increased, that a debtor could claim a "wildcard exemption"[4] of $1,150 against any type of property, plus up to $10,825 of any unused amount claimed over the debtor's homestead.  11 U.S.C.A. § 522(d)(5) (West 2010) (providing for the exemption dollar amounts at the time of filing, which are subject to adjustment pursuant to § 104).  In turn, the homestead exemption provision claimed by Debtor at the time of filing provided for up to $21,625 to claim against a homestead.  *Id.* at (d)(1) .  Debtor here has claimed $16,047 against her homestead, leaving $6,728 to claim as a wildcard exemption, which was used by Debtor to exempt part of the 24.5% interest in the API stock.  [Case No. 11-10483; ECF

---

[4] "An amount of property prescribed by state law up to a specific dollar amount that a debtor may exempt, regardless of the property's nature, from bankruptcy." *Wildcard Exemption*, *Black's Law Dictionary* (10th ed. 2014).

No. 1 at 14].  An $800 deduction is attributable to the Harlingen Area Teacher's Credit Union checking account, and therefore the maximum wildcard exemption available is $5,928. This amount was recaptured by Debtor from the chapter 7 estate. However, as Debtor utilized Texas exemptions in her chapter 13 case, the wildcard API stock interest recaptured by Debtor in the chapter 7 case  could not be exempted in the chapter 13 case, and was thus captured for the benefit of the chapter 13 estate from Debtor's hands.  *Id.* at 13 (Debtor's chapter 13 Schedule C lacks any exemptions over the API stock exempted in the chapter 7). This Court will proceed to evaluate whether there are any additional theories by which Debtor could have recaptured any API interest above and beyond the wildcard exemption.

     3.   *Taylor,* Exemptions From the Estate

     Romo's failure to object to Debtor's claimed "unknown" exemption over the API stock in the chapter 7 case risks his forfeiture of that interest, depending on the applicability of case law. There remains a question as to whether Romo can claim for the chapter 7 estate the value of the API stock beyond what has been claimed as an unknown exemption in the chapter 7 Schedule C. In *Schwab v. Reilly*, the Supreme Court held that an interested party, including the trustee, need not object to an exemption if the debtor's claimed exemption is within the limits provisioned by the bankruptcy code.  560 U.S. 770, 790 (2010).  In so holding, the Court discussed its previous holding in *Taylor v. Freeland & Kronz*,  503 U.S. 638, 643-44 (1992), wherein the Court held that an interested party is duty-bound to object to a claimed exemption if the amount is not within prescribed statutory limits, the failure of which would result in the chapter 7 trustee being unable to capture an amount above and beyond the claimed exemption for inability to object to the exemption, even if there is no colorable authority to so claim such exemption. *Reilly*, 560 U.S. at 790.  The Court noted that the statutory limits for exemptions was

exceeded in *Taylor* where the debtor claimed the value of the exemption as "$ unknown." *Reilly*, 560 U.S. at 790.  The pivotal difference between *Taylor* and *Reilly* was that "unknown" was not literally within the numerical guidelines set forth by the Code's exemption laws, while  putting a number within the facial limits of an exemption law was within those guidelines, where the former raises a "warning flag" that warrants an objection and the latter does not.  *Id.* at 789.

Here, Debtor's chapter 7 Schedule C likewise claims an "unknown" value exemption and an "unknown" property value on Schedule C.  [Case No. 11-10483; ECF No. 1 at 14].  Romo's failure to object to the claimed unknown exemption within 30 days of the first § 341 meeting of creditors bears a resemblance to the facts in *Taylor*, and if that resemblance were to prevail, Romo would lose his ability to use the API interest for the benefit of the estate, since it is clear from the outcome of *Taylor* that a claim for an "unknown" exemption is essentially a value pegged to the value of the unknown asset once clearly realized, even where that liquidation yields a value higher than the allotted statutory amount.  *Taylor*, 503 at 642-43 (denying the trustee's demand that debtors turn over the proceeds of a settlement when the trustee failed to object the claimed exemption value as "unknown").  Approximately five months into the chapter 7 case, Romo filed a Notice of Assets on January 18, 2012.  [ECF No. 15].  Pursuant to Fed. R. Bankr. P. 3002(c)(5), Romo set the bar date for filing a claim to April 17, 2012.  *Id.*  According to the claims register, the total amount of allowed claims filed in the chapter 7 case was $60,948.11, of which $46,067.28 constitutes allowed unsecured claims. No objections to any filed claims have been initiated in the chapter 7 case. The same day, January 18, 2012, in which Romo filed his Notice of Assets, a § 341 Meeting of Creditors was held. Much like in *Taylor*, all parties in interest failed to timely object to the chapter 7 "unknown" exemption over the API stock in Schedule B within 30 days after the § 341(a) meeting of creditors was held, as required

by Rule 4003(b)(1), which provisions that:

> a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under §341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later

Fed. R. Bankr. P. 4003(b)(1); *see also Taylor*, 503 at 642.  The exemptions have not thereafter been amended, as would have restarted the clock pursuant to Rule 4003(b)(1).  To Romo's fortune, he has not forfeited his right to the API stock under the law in *Taylor*. *Reilly* and *Taylor* both involve cases in which a debtor *had filed an objection* to a trustee's assertion over an interest in the property above and beyond the claimed exemption; in *Taylor*, it was a turnover demand for the proceeds of an estate owned lawsuit in which the exemption was unknown (i.e. full value) and the debtor objected, and in *Reilly*, the Court entertained the *Taylor* question where the trustee sought to liquidate the value of the property beyond the claimed exemption and the debtor objected.   *Reilly*, 560 U.S. at 776; *Taylor*, 503 U.S. at 641.  Here, there is no such objection claiming that Romo, on behalf of the chapter 7 estate, does not own the full value of the API stock. For the foregoing reasons, this Court concludes that Romo has not foreclosed the estate's ownership of the API stock interest by virtue of failing to object to the claimed exemption, even though there was no colorable basis for Debtor to file an "unknown" exemption.  However, the inquiry as to the ownership of the API stock does not end there.

    4.  <u>Statutory Abandonment of Property of the Estate</u>

In further evaluating which estate held the API stock, this Court must determine whether Romo has, at any time, abandoned the API stock, such that it would revert back to the interest of Debtor. *See generally* 11 U.S.C. § 554.  Section 554 provides three processes by which an estate can abandon property of the estate. Pursuant to § 554(a), the trustee may, after notice and a hearing, abandon property of the estate if it is burdensome or of inconsequential value and

benefit to the estate. Section 554(b) provides that a party in interest may request notice and a hearing to ask the court to order the trustee to abandon burdensome or non-valuable and non-beneficial property. Under § 554(c), unless the court otherwise orders, scheduled property of the estate not otherwise administered upon the *closing* of the case is then abandoned to the debtor and administered pursuant to § 350, which in turn provisions for the closing of a bankruptcy case by final decree. Finally, and unless the court orders otherwise, § 554(d) provides that property of the estate that is *not* abandoned under the foregoing provisions will remain property of the estate. Upon abandonment, the property of the estate shall normally revert back all legal and equitable interest to the debtor, generally where the debtor holds the possessory interest to the property.  5 *Collier on Bankr.* ¶ 554.02[3].

Here, there are no statutory grounds by which the estate's interest in the API stock has been abandoned. Neither the trustee nor any party in interest have motioned for the abandonment of the API stock interest, and thus § 554(b)-(c)'s burdensomeness or inconsequential value rationales cannot apply to divest the chapter 7 estate of the asset. Also, the chapter 7 case remains open and in administration, thus failing the argument for abandonment on the grounds of § 554(c)'s pure operation of law of reversion.

Due to the API interest's entry into the chapter 7 estate and the lack of abandonment of the property by Romo, this Court concludes that the API interest is property of the chapter 7 bankruptcy estate, subject only to the wildcard exemption in that case.

5.  <u>The Chapter 13 Estate's Interest</u>

Under 11 U.S.C. § 1306, property of a chapter 13 estate includes all property generated pursuant to § 541, and additionally includes all property that the debtor acquires after the commencement of the case, granted that such property is not exempted. As Debtor could claim

no exemption for the recaptured $5,928 in API interest under Texas law, which does not provision for a wildcard exception, in her chapter 13 case, Debtor's minor interest of $5,928 entered into the chapter 13 estate by operation of § 1306 for payment of claims. Debtor has *not* reacquired the rest of the 24.5% API stock interest because that interest was never relinquished by the chapter 7 estate. It has long been held, under the so-called single estate rule, that the same property may not be owned by two estates. *In re McMahan*, 481 B.R. 901, 912 (Bankr. S.D. Tex. 2012). Therefore, as long as the chapter 7 estate holds the interest, there is no chance that the chapter 13 estate may hold the same interest. Accordingly, the API interest was not part of the chapter 13 estate at the time the parties entered into the Settlement, except to the extent of the *de minimus*[5] non-exempt portion that was carried over from the chapter 7 case into the chapter 13 case.

### B. Whether the Settlement is Property of the Chapter 7 Estate, Chapter 13 Estate, or Both

Section 541(a)(1) is not the only provision governing what becomes property of the estate. Two companion provisions are of note in the instant matter:  § 541(a)(6) and § 541(a)(7).

1. Proceeds of the Estate Under § 541(a)(6)

Section 541(a)(6) provisions that proceeds, product, offspring, rents, or profits *of or from property of the estate* shall become property of the estate themselves. The reason for this is intuitive: the estate should enjoy the benefits of the use and ownership of its property. It is fairly conclusive what a proceed from property would be from the plain meaning of the word, which includes examples such as "that which proceeds, is derived, or results from something else; that which is obtained or gained by any transaction or process... *esp.* the money obtained from an event, activity, or enterprise." *Proceed, Oxford English Dictionary*.  *See also Proceeds, Black's*

---

[5] "2. (Of a fact or thing) so insignificant that a court may overlook it in deciding an issue or case." *De Minimus*, *Black's Law Dictionary* (10th ed. 2014).

*Law Dictionary* (10th ed.) ("1. The value of land, goods, or investment when converted into money; the amount of money received from a sale…2. Something received upon selling, exchanging, collecting, or otherwise disposing of collateral").

### a) Chapter 13 Proceeds

From an analysis of the State Court Case, it is conclusive that Debtor's claims in the State Court Case lawsuit are not a proceed, product, offspring, rent or profit of or from the chapter 7 estate, but rather of the chapter 13 estate. Romo was not a party to that case. Moreover, Debtor and Daniel Wright, as Plaintiffs, claim causes of action that relate to the Plaintiffs' assertion that API and the Tomlinsons have been mismanaging API's finances to the financial and emotional detriment of Plaintiffs alone. At the Hearing, this Court asked the parties whether the fact that the State Court Case lawsuit relates to damages that would not exist but for the existence of API stock would render the lawsuit property of the chapter 7 estate. As Debtor points out in response, there is a fine line between damage to the API stock directly and damage to an individual that merely traces its origin back to ownership of the stock.  [Case No. 13-10472; ECF No. 80] ("As with any human affair, all events involving a debtor may be traced to an earlier event. In sum, we are all products of our past.") (citing *In re Patterson*, 2008 WL 2276961, at *5-6 (Bankr. N.D. Ohio June 3, 2008)).   Via briefing, Romo makes no claim that Debtor's personal financial and emotional injury derive from the API stock. Instead, Romo asserts that his consideration includes releasing the API stock interest itself, releasing his potential claims against API and Peggy Tomlinson for their role in injuring the API stock and its distributions, releasing a potential claim against Debtor for purportedly transferring API stock, and releasing a potential claim against Debtor for improperly retaining a distribution of $49,000 on account of the API stock.  [Case No. 11-10483; ECF No. 80 at ¶ 18].  Romo asserts that the *$100,000 Carveout* to the chapter 7 estate

is a proceed of the estate's interests surrounding the API stock for these reasons, as distinct from the proceeds attributable to the State Court Case litigation.  *Id* at ¶ 23.  This Court finds that the State Court Case causes of action by Debtor against API and the Tomlinsons for financial mismanagement leading to financial damages and emotional distress inure only to Plaintiffs, because the State Court Case was initiated on account of the fact that Debtor received erroneous distribution reports for which she *did not* own the API stock and did not receive the commensurate distributions (to which the chapter 7 estate would have been entitled).  [Romo Ex. 4 at ¶¶ 14-31]. More specifically, Plaintiffs claim conversion and breach of fiduciary duty by the act of issuing erroneous K-1s while pilfering the actual cash.  *Id.*  Plaintiffs further allege civil conspiracy by the Defendants for filing the false K-1s in an effort to minimize their own tax liability.  *Id.*  The remainder of the causes of action derive from substantially similar accusations, but Plaintiffs importantly allege personal financial damages and emotional damages for the maximum $750,000 pursuant to the state court's jurisdictional limit.  *Id.*  Romo's amended brief points out that Debtor illegally retained distributions pursuant to the K-1s, which constitute proceeds from the chapter 7 interest in the API stock.  [ECF No. 80 at ¶ 6].  This fact does not render the State Court Case a proceed from the API stock interest, as Romo's claim against Debtor for interfering with property of the chapter 7 estate is *independent* of the injury API and the Tomlinsons personally inflicted upon Debtor, even though the State Court Case litigation claims have some historical relationship to Debtor's *former* ownership of the API stock. Debtor allegedly attempting to retain control of the API interest and its distribution proceeds, but that is a separate claim that Romo asserts against Debtor. Assuming the allegations *arguendo*, where API failed to distribute funds in accordance with the commensurate ownership level in the company, Romo would hold a claim against API for the money, but Debtor would hold a claim

against API for imputing her name to the K-1s and creating IRS-based and emotionally-based harm. Those are distinct claims. Thus, the State Court lawsuit was derived from injuries entirely personal to Debtor and does not constitute property of the chapter 7 estate. Therefore, as Debtor's waiver of her asserted cause of action (which is owned by the chapter 13 estate pursuant to § 1306) in State Court is the chapter 13 estate's consideration to the Settlement, a portion of the Settlement is property of the chapter 13 estate. This does not end the analysis, because the Settlement agreement is of a mixed nature, where the chapter 7 estate also owns a portion of the Settlement.

### b)  The Chapter 7 Proceeds

This Court concurs with Romo that his releases of the API stock interest and his potential claims against Debtor, API, and the Tomlinsons for their interference with the API stock and retention of its proceeds does make Romo's $100,000 portion of the Settlement property of the chapter 7 estate.  [Case No. 11-10483; ECF No. 79 at ¶ 25].  However, this Court must evaluate the potential objections to this conclusion.

Debtor lodges several arguments to illustrate that it would be inappropriate to allow Romo to take any distribution from API pursuant to the Settlement agreement.  [Case No. 13-10472; ECF No. 80].  In support of this argument, Debtor issues a rather exhaustive panoply of arguments.

*Pure Proceeds of the Lawsuit Argument:* First, Debtor protests that the $100,000 Carveout for Romo are not property of the chapter 7 estate, because the Settlement is fully associated with Plaintiffs' lawsuit against the Defendants for damages personally experienced to them.  *Id.*  This is incorrect. While it is true that the Settlement contains consideration from Debtor's post-petition cause of action, thus rendering *at least some* of the Settlement an interest

derivative thereto, Romo dropped his potential claims against the parties to the Settlement and turned over 24.5% of the chapter 7 estate's interest in the API stock as part and in consideration of the Settlement.

*Definitional Argument:* Next, Debtor defines, using Black's Law Dictionary (hereinafter "**Black's**"), "proceeds" from § 541(a)(6) in order to assert that the $100,000 Carveout is not property of the chapter 7 estate. *Id.* at ¶ 19. Debtor offers her own version of "proceeds" not found in Black's, which Debtor describes as "issues; produce; money obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property."[6] *Id.* Though Debtor relies on what appears to be a different definition from Black's that this Court has not found in the 10th edition, Debtor is correct to imply that "there must be a 'sale' or 'conversion' of property into money or other property," although this Court reserves itself the possibility to determine any alternative forms of proceeds that may arise in the future (such as, perhaps, the conversion of property into services). However, Debtor is wrong to assert that this means that Romo's distribution and the Settlement are not proceeds of chapter 7 estate property to some extent. This Court has already concluded that Romo waived his claims and traded the estate's API stock interest for $100,000. This is certainly a sale or conversion.

*Contract Interpretation Argument:* Furthermore, Debtor claims that a careful reading of the Settlement shows that the $100,000 provision for the chapter 7 estate itself derives from the settlement of claims and controversies between the named parties to the state court litigation, to which Romo is not a party. Debtor first argues that Romo is not a party to the State Court Case. While this may be true, it still remains that Romo had potential claims against the parties and he is giving up the chapter 7 estate's interest in API stock in exchange for cash. The fact that cash

---

[6] There is no such definition in the 10th edition of Black's, to which Debtor claims to cite. A language search of the Black's database in Westlaw for a sample string, "money obtained by the sale," yields no results on any word definition.

and stock are to be traded by two parties, by a *written* instrument that is a *contract* shows that the exchange is a "sale" or "conversion" of the chapter 7 estate's API stock into money, thus rendering the $100,000 a "proceed" from *the chapter 7 estate's* interest. There is no indication in any form that the parties somehow provided for the $100,000 Carveout provision because Debtor was releasing solely *her* cause of action. The Settlement states in paragraph 10, subpoint 1 that "$100,000 shall be paid to William C. Romo."  [Romo Ex. 1 at ¶ 10].  Paragraph 11 clearly states that "the Bankruptcy Trustee shall release API… and Vicky Gribble Wright from any and all claims which may have been asserted by the Bankruptcy Trustee and shall release and transfer all shares held within Vicky Gribble Wright's Chapter 7 Bankruptcy estate to API…" *Id.* at ¶ 11.  A careful reading of the Settlement thus dictates an opposite conclusion, in that the parties *clearly and manifestly* intended to give Romo $100,000 in lieu of a release of his potential claim against API, the Tomlinsons, and Debtor. Debtor seems to argue that these plain terms, which explicitly provision for such an exchange, should be overridden by a stretched reading - that since the Settlement includes the State Court Case name at the top of the document, only the named parties, to wit, Plaintiffs, the Tomlinsons, and API may share in its spoils. Specifically, Debtor's logic is that "[t]he parties could have drafted the settlement agreement without reference to [the State Court Case], but they chose not to do so implying that it was that controversy they were settling."  [Case No. 13-10472; ECF No. 80 at ¶ 19]. Then, Debtor points to paragraph 1 of the Settlement, which states that "[t]he parties hereto agree to settle all claims and controversies between them which are asserted or assertable in this agreement."  [Trustee Ex. 1 at ¶ 1].  By this logic, this Court must ignore the fact that the Settlement clearly contemplates the payment of $100,000 to Romo, "a party thereto," for which Romo would release property of the chapter 7 estate and his related claims, which are, in fact,

"assertable." It would take stronger evidence to override the plain meaning of the Settlement as a contract. Such an interpretation belies the methods of interpreting a contract under Texas law, which requires a court to "ascertain the true intent of the parties *as expressed in the instrument*" and read the "terms used in the [contract] [with] their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).  Here, there is an obvious manifestation of the parties' intention to include Romo in the agreement in consideration for his release of the API stock and his potential claims against Debtor, API, and the Tomlinsons in a global agreement, and a manifest intent to the contrary is not evinced.

*Consideration Argument:* Debtor also asserts that Romo was entirely without consideration to sign the Settlement agreement and should never have attended the Settlement conference. The logic of this assertion is that there had been no unanimous consent to the purported transfer of stock to Gary Cain, the stock thus never transferred, and Romo thus has no claim and no consideration to be part of the Settlement agreement.  [Case No. 13-10472; ECF No. 75 at ¶ 6].  It is true that under Texas law, the lack of consideration is an affirmative defense to the enforcement of a contract by its terms.  *Doncaster v. Hernaiz*, 161 S.W. 3d 594, 603 (Tex. App. 2005).  However, the existence of a written contract presumes consideration for its execution.  *Id.*  Moreover, at least one court, in a sanctions hearing on the frivolity of the argument, has entertained the notion that a debtor can violate the automatic stay by *attempting* to control property of the chapter 7 estate by engaging in litigation related to such property,  *In re Walker*, 356 B.R. 834, 857 (Bankr. S.D. Fla. 2006), thereby showing that Romo could, by law, have the very consideration Debtor seeks to deny. Plus, the very terms of the transfer document show that the parties to the transfer may independently sign separate copies of the document to

full legal effect.  [Debtor Ex. 4].   Debtor has shown no credible evidence that other parties to the unanimous consent and transfer had not signed the document, except for her unsupported testimony that she never received funds from that supposed exchange with Gary Cain, but for which she furnished no financial evidence, such as financial accounts showing the non-existence of a deposit. In any event, this line of argument entirely ignores the fact that Debtor's alleged receipt of $49,000 in improper K-1 distributions remains a live issue. Debtor's argument is not persuasive, as it is assuredly true that Romo belonged at the Settlement table, given his colorable claims and the chapter 7 estate's ownership of the API stock.

*Res Judicata Argument:* Debtor further argues that since this Court disallowed Romo's chapter 13 claim before the Settlement had been executed, Romo had no claim to settle and he therefore lacked consideration to the Settlement agreement ultimately executed by the parties. [Case No. 13-10472; ECF No. 75 at ¶ 14].   The argument raises a potential *res judicata* defense caused by the final order disallowing the claim in the chapter 13 case. However a fair reading of this Court's Order Disallowing Claim of William C. Romo, Chapter 7 Trustee,  [ECF No. 58], would, at the very most, say that Romo's claim was disallowed in the chapter 13 because his claim belongs strictly in the chapter 7, for it reads, "[t]he Court heard no objection to the Objection. After due consideration, the Court finds that the relief should be granted... IT IS ORDERED that the claim of [Romo] is hereby disallowed." Nothing in this order references Romo's remedies via his position as trustee in the chapter 7 case, such as the disposition of his assets or the initiation of an adversary complaint. Thus, this Court finds that Romo's claims in the chapter 7 case are out of reach of a *res judicata* defense by a final order in the chapter 13 case.

In summary, this Court finds that the chapter 7 estate's share of the distribution does constitute a "proceed" of the chapter 7 property, pursuant to § 541(a)(6).

2. Post-Petition Estate Acquisitions under § 541(a)(7)

Debtor separately argues that the $100,000 Carveout is strictly derived from a cause of action solely held by Debtor and arising post-petition, thus rendering said proceeds outside of the scope of § 541(a)(7), which captures "[a]ny interest in property that the estate acquires after the commencement of the case." It is undoubtedly correct that a debtor's post-petition cause of action is not property of the estate. *See, e.g. Witko v. Menotte*, 374 F.3d 1040 (11th Cir. 2004). *But see Matter of Wischan*, 77 F.3d at 877 (*pre*-petition causes of action and their *post*-petition proceeds are property of the estate). Here, Debtor's cause of action attributable to API's financial mismanagement arose post-petition to the chapter 7 (2012 and 2013 K-1s), and to that extent, the State Court Case cause of action and a portion of the Settlement proceeds thereto are not property of the chapter 7 estate, as the chapter 7 estate did not itself accrue that cause of action and it is therefore not an "interest in property that *the estate* acquires after the commencement of the case." § 541(a)(7) (emphasis added). An exception to the usual rule that post-petition Debtor acquired interests are not property of the estate once existed under Supreme Court law, where the Court employed a two prong test in that: 1. "the post-petition acquired asset be sufficiently rooted in the pre-bankruptcy past" and; 2. "[it be] so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5)." *Segal v. Rochelle*, 382 U.S. 375 (1966) (construing the governing pre-Code provision at the time). The Fifth Circuit, *en banc*, took the opportunity to examine the continuing validity of the Supreme Court's two prong test in a case where the debtor experienced a crop loss pre-petition, for which he was not eligible for disaster relief at that time, the legislature made the

debtor's loss eligible for disaster relief post-petition, and the debtor received disaster relief post-petition. *In re Burgess*, 438 F.3d 493 (5th Cir. 2006). The trustee and amici argued to the Fifth Circuit panel that because the crop loss for which the debtor became entitled to relief had occurred pre-petition, the entitlement to relief was "sufficiently rooted" in the pre-bankruptcy past and thus became property of the estate. *Id.* at 498. In eschewing the Supreme Court's *Segal* test, the Fifth Circuit noted that the "sufficiently rooted" test in the first prong of the Supreme Court's analysis had not survived in § 541, as the successor to § 70(a), in the enactment of the Bankruptcy Code. *Id.* The Fifth Circuit also rejected the notion that any provision of § 541 rendered the disaster relief property of the estate. The Fifth Circuit distinguished cases in which the debtor holds a pre-petition accrued cause of action, which becomes property of the estate under § 541(a)(1), and receives a post-petition judgment thereto, which is a proceed of property of the estate under § 541(a)(6). *Id.* at 499. By contrast, the Fifth Circuit found that the debtor's disaster relief was not property of the estate, because there was absolutely no legal right to relief at the time in which he filed bankruptcy, the legislature having not yet enacted a provision for disaster relief. *Id.* at 500. Much like the case disposed of by the Fifth Circuit in *In re Burgess*, Debtor here held no legal interest in a cause of action, because no alleged financial mismanagement had yet occurred against Debtor. Debtor's cause of action purely arose after the filing of the chapter 7 and occurred solely to the detriment of Debtor. Thus, Debtor's State Court cause of action was not acquired by the chapter 7 estate on account of its own property.

Regardless, Romo brought his own consideration to the table in the fact that he released API stock and released his potential claims, which therefore resulted in Romo's $100,000 share of the Settlement to be a proceed pursuant to § 541(a)(6), thus rendering irrelevant the chapter 7 estate's lack of § 541(a)(7) ownership of the Settlement.

In conclusion, Romo's interest and Debtor's interest are both inextricably woven into the fabric of the Settlement as consideration. Thus, this Court holds that the Settlement is of a mixed nature – partially proceeds of the chapter 7 estate and partially Debtor's separate interests which inure to the chapter 13 estate.

### C.  Whether This Court Should Approve the Chapter 7 or Chapter 13 Compromise

Having thusly concluded that the 24.5% API stock interest is and has been property of the chapter 7 bankruptcy estate, this Court must now determine whether to approve the Chapter 7 or the Chapter 13 Compromise. Rule 9019 has two provisions pertaining to potential compromises, which state that:

> (a) Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

> (b) Authority To Compromise or Settle Controversies Within Classes. After a hearing on such notice as the court may direct, the court may fix a class or classes of controversies and authorize the trustee to compromise or settle controversies within such class or classes without further hearing or notice.

Fed. R. Bankr. P. 9019(a)-(b).  In addition to the provisions of Rule 9019, the Fifth Circuit has provided guidance on what qualifies as "fair, equitable, and in the best interest of the estate."  *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980); *In re Roqumore*, 393 B.R. 474, 479-80 (Bankr. S.D. Tex. 2008); *see also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power. Coop., Inc. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997).  The Fifth Circuit in *In re Cajun Elec. Power Coop.* stated that bankruptcy judges must consider the following factors when evaluating a settlement:

> (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,
> (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and
> (3) All other factors bearing on the wisdom of the compromise.

119 F.3d at 356; *see also In re Jackson Brewing Co.*, 624 F.2d at 602. Furthermore, the Fifth Circuit has expanded upon the third factor by adding that courts must consider "[w]hether the compromise serves the paramount interest of creditors with proper deference to their reasonable views" and "[t]he extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion." *In re Roquemore*, 393 B.R. at 480 (citing to *In re Cajun Elec. Power Coop.*, 119 F.3d at 356, and *In re Foster Mortgage Corp.*, 63 F.3d 914, 917 (5th Cir. 1995)). A court may exercise discretion to determine whether the proposed compromise or settlement warrants approval. *Lindauer v. Traxler (In re Traxler)*, 277 B.R. 699, 702 (Bankr. E.D. Tex. 2002) (citing to *In re Jackson Brewing Co.*, 624 F.2d at 602-03). The decision to approve a compromise "lies within the discretion of the trial judge." *In re AWECO, Inc.,* 725 F.2d 293, 297 (5th Cir. 1984). The Court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *Cajun Elec.,* 119 F.3d at 355.

The first factor in analyzing whether a compromise is fair, equitable, and in the best interests of the estate requires that this Court first look to the plaintiff's "probability of success in the litigation, with due consideration for the uncertainty in fact and law." *In re Cajun Elec.*, 119 F.3d 356. This Court reiterates that in evaluating a settlement, "a bankruptcy court need not conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *In re Age Refining, Inc.*, 801 F.3d 530, 541 (5th Cir. 2015). This Court would add that it need not conduct a mini-trial on the true valuation of property relinquished in a settlement. There are three sets of waivers that are relevant here: Debtor's claims and Romo's claims and API stock property. As to Debtor's claims, the relevant litigation to assess is the underlying State Court Case, wherein Debtor alleges that API damaged her by virtue of financial improprieties in connection with financial mismanagement. No evidence has been furnished that Debtor's five

claims will likely prevail, which thereby gives no instruction as to whether a beneficial settlement constitutes a favorable alternative. *See In re Age Refining, Inc.*, 801 F.3d at 542 (finding the risk of failure the appropriate analysis as to whether a settlement is a fair, equitable, and favorable alternative).   Debtor presents five claims relating to the alleged financial mismanagement of Defendants, and yet she only furnishes a series of K-1 distribution forms into evidence, without any corroborating evidence, aside from her own testimony that she received K-1's without receiving the commensurate income. This Court simply cannot fairly evaluate the likelihood of success on the merits with the thin evidence presented before it. Romo, who has potential claims for interference with the API stock interest as property of the estate, wrote in his Motion to Compromise that he believes that he would likely succeed were he to pursue his claims, with the caveat that he has not evaluated any likely affirmative defenses.  [Case No. 11-10483; ECF No. 69 at ¶ 17].  There is little indication as to the likelihood of Romo's success or failure. Nor was there any credible evidence presented at the Hearing as to the value of the API stock Romo sought to relinquish in the Settlement. This Court therefore concludes that the first *Cajun Elec.* factor militates against a finding that the Chapter 7 Compromise should be approved.

The second factor from *Cajun Elec.* requires that this Court weigh the potential "complexity and likely duration of the litigation and any attendant expense [and] inconvenience." *Cajun Elec.*, 119 F.3d at 356.  Here, the chapter 13 case being in arrears and pending dismissal by motion of the chapter 13 trustee,  [Case No. 13-10472; ECF No. 76], the potential for the State Court Case litigation to proceed further would be highly inconvenient to Debtor and her creditors in her chapter 13 case. Debtor is in need of immediate relief to continue her chapter 13 case, which makes this Court's consideration of the "likely duration" of the

litigation all the more pressing. This Court can conclude that the State Court Case litigation is complex. Plaintiffs assert against Defendants that there was financial mismanagement leading to tax liability and that the Tomlinsons stole distributions.  [Trustee Ex. 4].  However, in the State Court Case, Plaintiffs assert five causes of action and three types of damages accountable to each of them: past mental anguish; future mental anguish; and financial losses.  [Trustee Ex. 4].  This would greatly increase the difficulty of the questions in litigation in having to parse out multiple facets of damages with respect to each cause of action to a jury, especially where it concerns proving mental anguish damages. A great deal of discovery and depositions are usually involved in such a matter. In addition, a great deal of financial investigation of API and Defendants would be required. This Court concludes that taking proceeds from the Settlement would prove a better route for Debtor and the companion estates.

As to the complexity of Romo's claims, though Romo does not believe the issues of Debtor's interference with the API interest to be particularly complex, he asserts that he has not investigated any possible defenses, which would greatly increase the complexity of the claim and any attendant litigation.  [Case No. 11-10483; ECF No. 69 at ¶ 15].  Though this alone does not assist Romo's Chapter 7 Compromise, Romo also persuasively notes that if the Settlement is not approved, he anticipates expenses in litigation and discovery, including depositions and financial analysis of API, which he alleges would lead to the expensive necessity of liquidating the API interest instead and lead to $25,000 in litigation costs.  *Id.*  As Romo only requests $100,000, his estimate of $25,000 in potential litigation costs would be a great and unnecessary expense for the alternative of an adversary proceeding that may not pan out.  Since it would not benefit the chapter 7 estate to maximize the value of the global Settlement any further in favor of Romo's distribution, Romo having credibly testified that $100,000 is adequate to close the chapter 7

estate, this Court concludes that the second *Cajun Elec.* factor favors Romo's settlement of his claims and relinquishment of API stock, particularly where his participation most likely assisted the remaining parties in extracting a superior deal. Therefore, the second *Cajun Elec.* factor militates towards approving the Chapter 7 Compromise.

The third *Cajun Elec.* factor evaluates the "wisdom of the compromise," which is broken into two more specific factors– that is "[w]hether the compromise serves the paramount interest of creditors with proper deference to their reasonable reviews" and "[t]he extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion." *In re Roqumore*, 393 B.R. at 480.

It is not settled law as to how or whether, when this Court is evaluating the competing Chapter 7 Compromise and Chapter 13 Compromise, this Court is meant to conjunctively compare the interests of the creditors from the competing estates. However, given that the chapter 7 estate owns the 24.5% API interest (minus the minor wildcard exemption), this Court will treat the interest of the chapter 7 estate as first-in-right over the chapter 13 estate for the purpose of evaluating whether the Chapter 7 Compromise, which honors Romo's right to collect $100,000, is superior to the Chapter 13 Compromise, which seeks to eradicate Romo's right to collect $100,000. Here, the Chapter 7 Compromise would serve the paramount interest of the creditors in the chapter 7 case. The Settlement directs that the chapter 7 estate will receive $100,000, which Romo has testified is what he believes he will need, in combination with the $12,446 K-1 payment that he has already received, to reasonably satisfy 100% of the allowed unsecured claims, trustee's fees, and expenses in order to close the chapter 7 estate. Debtor argues that the Chapter 13 Compromise should be approved in the chapter 13 case, because that would be in the best interest of the chapter 13 creditors. However, this argument does not give

proper deference to the "reasonable views" of the chapter 13 creditors, as required by the first component of the "wisdom of the compromise." The chapter 13 interests come second to the satisfaction of the chapter 7 interests with respect to the $100,000 Carveout, because the API stock is property of the chapter 7 estate. At the Hearing, Debtor's chapter 13 counsel argued that this Court should modify the underlying Settlement agreement, pursuant to the Chapter 13 Compromise, in order to disallow the $100,000 Carveout to Romo, or, alternatively, that Romo did not maximize the Settlement payout. However, Debtor offered no evidence that substantiates this argument. Debtor also advocated for approval of the Chapter 13 Compromise because Romo should be forced to independently liquidate the API interest outside of the Settlement. However, Debtor has not explained how Romo would have any remaining claims or ownership of the API stock once the terms of the Chapter 13 Compromise would have Romo release all of his claims and interest with respect to the API stock. In summary, this Court is not sufficiently convinced that there is any reasonable view to conclude that the Settlement should be modified in accordance with the Chapter 13 Motion. The satisfaction of the chapter 13 creditors must rely on Debtor's payout pursuant to the original terms of the Settlement, as accurately reflected in the Chapter 7 Compromise. Waiting for the chapter 7 estate to close and for any remaining chapter 7 money to remit to Debtor and her chapter 13 estate would provide the most appropriate deference to reasonable creditor interests.

The remaining point of analysis here is which proposed motion for this Court to approve the Settlement best reflects "a [true]… product of arms-length bargaining and not of fraud or collusion." *In re Roqumore*, 393 B.R. at 480. As to this second component to the wisdom of the compromise, there is no evidence to conclude that the Settlement was anything but arms-length in its bargain, with neither fraud nor collusion. All parties at the Settlement were represented by

counsel. Debtor protests that the chapter 13 creditors were not present at the Settlement talks. However, as previously discussed, with respect to the $100,000 Carveout, which is a proceed of the chapter 7 estate, the chapter 7 creditors are first in right. This Court believes that all interests have been adequately met pursuant to this Settlement in a valid, arms-length bargain.

This Court finally reiterates that, having concluded that the chapter 7 estate alone owned the API stock interest, subject to a minimal wildcard exemption, Romo was the only one with the authority to transfer the API stock interest and any attendant causes of action as consideration to his portion of the Settlement. Where the Chapter 13 Compromise seeks to relieve the chapter 7 estate of its rightful property, and where the Chapter 7 Compromise more accurately reflects the actual terms of the Settlement, including the rightful distribution to the chapter 7 estate of its property, this Court is fully inclined to choose the Chapter 7 Compromise over the Chapter 13 Compromise.

While this Court is not convinced that Romo presents an adequate showing in favor of the first *Cajun Elec.* factor in the probability of success in litigation, the second factor in expense, duration, and complexity sways in favor of approval of the chapter 7 Compromise, as does the third factor regarding the wisdom of the compromise. In summary, this Court should approve the Chapter 7 Compromise.

This Court has extensively concluded that the $100,000 Carveout is property of the chapter 7, not chapter 13, estate. It is therefore concluded that where the Chapter 7 Compromise has been deemed appropriate under the *Cajun Elec.* factors, and the Chapter 13 Compromise seeks to deny the chapter 7 estate of its rightful property, the Chapter 13 Compromise must be denied.

**D.  Grissom's Requirement to File a Fee Application**

In addition to the foregoing analysis of the Chapter 7 Compromise under the *Cajun Elec.* factors as "fair, equitable, and in the best interest of the estate," 119 F.3d at 355, this Court must reiterate its concerns as to whether Grissom may be paid pursuant to the Settlement. Grissom has not yet filed an application for compensation with this Court pursuant to Bankr. R. Civ. P. 2016, which provisions, *inter alia*, that an entity seeking compensation from the estate shall file an application "setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." It is hereby **ORDERED** that Grissom file a detailed application for compensation in compliance with case law, the Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

The issue of whether special counsel may collect fees and expenses from chapter 7 property can be quickly summarized: as per § 327, counsel may not be compensated from a chapter 7 estate unless employed by the trustee in that case. *Lamie v. United States Trustee*, 540 U.S. 526 (2004); *see also In re Palacios*, 2016 WL 361569, at *8 (Bankr. S.D. Tex. Jan. 27, 2016). In *Lamie*, the Supreme Court faced a bankruptcy case that had been filed as a chapter 11, wherein the debtor's attorney had been properly employed, but that was converted into a chapter 7 during the pendency of the case. 540 U.S. at 529. The debtor's attorney in *Lamie* thereafter sought compensation for work that he provided for the debtor *after* the case had been converted into a chapter 7. *Id.* In affirming the denial of the attorney's post-conversion fees, the Court found that the plain meaning of § 327 was such that only attorneys employed by the trustee in a chapter 7 case may be compensated from property of the chapter 7 estate. *Id.* at 535.

Here, this Court entered an Order Approving Employment of Counsel in the chapter 7, [Case No. 11-10483; ECF No. 41], case and the chapter 13 case. [Case No. 13-10472; ECF No.

72].   However, the approval of employment in the chapter 7 provisioned for Grissom to be counsel for Debtor, not counsel for Romo, which thus presents a § 327 and *Lamie* issue.

This Court has extensively concluded that the Settlement is of a mixed nature, apportioned as property of both the chapter 7 and 13 estates to some degree, presenting a potential *Lamie* issue in Grissom's compensation, over which this Court expressed concerns on the record. *See Lamie*, 540 U.S. at 535.

Section 330 contemplates the reasonable compensation of a professional person for "actual, necessary services…and… expenses."   11 U.S.C. § 330(a).   However, § 330 also provides that a court may *sua sponte*, via motion from any trustee, or via motion from other parties in interest "award compensation that is less than the amount of compensation that is requested." § 330(a)(2).

*Johnson v. Georgia Highway Express, Inc.*,  488 F.2d 714 (5th Cir. 1974), created a list of factors in determining the reasonableness of compensation to an attorney, which is applicable in the bankruptcy context.  *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977). These factors include:

1.  The time and labor required
2.  The novelty and difficulty of the questions
3.  The skill requisite to perform the legal service properly
4.  The preclusion of other employment by the attorney due to acceptance of the case
5.  The customary fee
6.  Whether the fee is fixed or contingent
7.  Time limitation imposed by the client or other circumstance
8.  The amount involved and the results obtained
9.  The experience, reputation, and ability of the attorneys
10. The "undesirability of the case
11. The nature and length of the professional relationship with the client
12. Awards in similar cases

*Id.* at 1298-99.

The *First Colonial Court* added two additional bankruptcy specific considerations, in that "the strong policy of the Bankruptcy Act that estates be administered as efficiently as possible [be recognized]" and to avoid "the possibility that some officers of the court may be furnishing services… in more than one capacity which could lead to…duplicative fees…for non-legal services." *Id.* at 1299-1300.

As Grissom has not yet filed a fee application, this Court will leave to a new day how much Grissom is requesting in compensation, whether that compensation is properly calculated to avoid violating *Lamie*, and whether Grissom's compensation is otherwise reasonable under the *Johnson* and *First Colonial Court* factors.

### E. Final Considerations for Resolution

This Court is presented with several more concerns that put a fly in the ointment and thus require a resolute conclusion.

In addition to the Chapter 7 Compromise and Chapter 13 Compromise, this Court will separately consider Debtor's argument that Romo should not be allowed to retain a check to Debtor in the amount of $12,446, which was allegedly for payment of taxes for her K-1 distribution for 2014. [Case No. 13-10472; ECF No. 80 at 5]. Debtor contends that if Romo is allowed to keep these funds, Debtor's present tax liability will be unsatisfied, thus burdening her chapter 13 estate. *Id.* However, K-1 disbursements of money on account of the *chapter 7's* interest in API are proceeds of chapter 7 property. Thus, Romo is entitled to keep said distribution for the benefit of the chapter 7 estate, especially where the underlying Settlement, to which Debtor agreed, provisioned for Romo to retain those funds. [Trustee Ex. 1 at ¶ 11].

This Court must also separately consider the underlying Settlement's provision for Debtor to release any remaining claim she "may have to the ownership interest in [API],

including any exemption she may hold under [§ 522(d)]." *Id.* This Court has already concluded, *supra* Section IV, that the maximum extent to which Debtor exempted the chapter 7 estate's interest in API was $5,928 and that such interest immediately entered into the chapter 13 estate through § 1306. While Debtor held no technical right of claim to the interest in the API wildcard exemption, it having been captured by the chapter 13 estate, and thus purported to release her non-existent claim over the wildcard exemption, this is not a fatal fly in the ointment for the approval of the Chapter 7 Compromise. On behalf of and to the benefit of the chapter 13 creditors, who will immediately capture any benefit that the Settlement attributes to Debtor, Debtor has helped to convert the chapter 13 estate's initial holding of $5,928 worth of API stock into $66,542.55 for the satisfaction of the chapter 13 creditors. Moreover, Debtor released the State Court claim to assist in this process, and any residual funds left in the chapter 7 estate following the satisfaction of the chapter 7 creditors will also inure to the benefit of the chapter 13 creditors. Given that the chapter 13 trustee has not objected to either Motion to Compromise and the chapter 13 estate's enjoyment of the benefit of the underlying Settlement bargain, this Court exercises its power to condition the approval of a settlement, under Rule 9019, in requiring that the chapter 13 estate relinquish any of its remaining claim to the non-exempt $5,928 of API stock that entered into the chapter 13 estate.

This Court must also independently consider a Motion to Strike filed in the chapter 13 case. On January 26, 2016, Debtor filed a Motion to Strike Affidavit, wherein Debtor seeks to strike Romo's Amended Brief in Support of Motion to Compromise (hereinafter "***Motion to Strike***" and "***Romo's Amended Brief***").   [Case No. 13-10472; ECF Nos. 84 and 87]; [simultaneously Case No. 11-10483; ECF Nos. 80 and 83] (the amended brief and motion to strike, respectively, filed simultaneously in both bankruptcy case).   Romo's amended brief is

substantively identical to his previous brief that remains in support of Romo's Chapter 7 Compromise. However, Romo references and attaches an affidavit in which he swears to certain facts regarding the conference resulting in the Settlement. This affidavit was filed after this Court conducted the Hearing and closed evidence, and contains Romo's assertion that corporate counsel for API, Mr. Janak, "explained to [Romo] that [API] desired to bring all parties asserting claims connected to [Debtor's] Membership Interest in [API] together to discuss a comprehensive resolution." [Case No. 13-10472; ECF No. 84-1 at ¶ 4]. Romo's affidavit as to what Mr. Janak declared on behalf of API's "desires" is blatant hearsay under Fed. R. Civ. P. 801 et. seq. Romo's Amended Brief must therefore be stricken for denying Debtor the opportunity to cross examine Romo on the facts sworn within the affidavit. Furthermore, the evidence to this matter was closed after the Hearing was concluded on December 18, 2015.

This Court finally considers Romo's estoppel claim, which argues that Debtor has adopted the position that Romo should not receive 100,000 in the chapter 7 case but that she failed to object to his receipt of the 100,000 in the chapter 13 case in support of her own Chapter 13 Compromise. [Case No. 11-10483; ECF No. 79 at ¶ 29]. This Court rejects Romo's argument that estoppel plays a factor in this case, because Debtor, in her Chapter 13 Compromise, although in a buried manner, does not adopt the Settlement wholesale, but rather requests the condition that Romo be disallowed from the Settlement's distribution and his $100,000 be redirected for the benefit of the chapter 13 estate. [Case No. 13-10472; ECF No. 75 at ¶ 16].

## V. Conclusion

For the foregoing reasons, this Court finds that the Chapter 7 Compromise should be **GRANTED** and the Chapter 13 Compromise should be **DENIED**. It is **ORDERED** that

Grissom file a fee application specifically delineating the amount he requests to be compensated for fees and expenses in accordance with all applicable law. The remainder of the proceeds payable to Debtor shall enter into the chapter 13 estate by a direct disbursement to Cindy Boudloche, chapter 13 trustee. As Debtor struck a fair bargain to the benefit of the chapter 13 creditors, any claim that the chapter 13 estate held to the wildcard exemption portion of the API stock in the chapter 7 proceeding is released pursuant to the Settlement. The chapter 7 estate, by and through its trustee, Romo, shall be entitled to retain the $12,446 K-1 payment mentioned in paragraph 11 of the underlying Settlement. The chapter 7 estate shall also be allowed to retain the $100,000 Carveout. To the extent that any property from the chapter 7 estate thereafter remains leftover, such remainder shall enter the chapter 13 estate, pursuant to § 1306, for the benefit of the chapter 13 creditors. The United States Treasury shall be allowed to retain its $326,914.90 portion of the Settlement. Romo's Amended Brief, filed in each respective case, is hereby **STRICKEN**.

Upon the issuance of this Memorandum Opinion, an Order consistent hereto shall simultaneously be entered.

SIGNED 02/11/2016.

Eduardo V. Rodriguez
United States Bankruptcy Judge